Would the clerk call the case, please? 3-14-06-56, People of the State of Illinois, X-Ray, Lisa Madigan, Appellee, v. Stephen Sulcansadi, v. Aero Specialty, Inc., Appellant, by John Urban. Thank you. Mr. Urban, good morning. Good morning. At the trial court, the people argued that they were allowed to conduct a warrantless search of my client's property based upon a particular statute and also case law. That was the case that was presented to the trial court and we argued the constitutionality of the search that was conducted. It was our position that the statute did not allow a warrantless search. The trial court decided the case, however, not on the arguments that were made before in terms of the constitutionality of the search, but rather that the items that were found on my client's property were in plain view. It was our position that there's not a scintilla, one scintilla of evidence that the evidence was in plain view. My client was found guilty of open dumping in terms of items that were photographed that were items number, or photographed items number 15, 16, 17. Those items, the evidence shows, were within this large, I believe it was 160 by 410 foot large concrete enclosure. That's where my client's business was being conducted. That is what the court found that my client was guilty of. And the evidence showed that Mr. Hartke, who was an agent of the Illinois Environmental Protection Agency, even though he was a county employee, Mr. Hartke, who the people admitted was an agent of the Illinois Environmental Protection Agency, in the record, as a response to the fact that he was a county employee, was a county employee. In response to our affirmative defense that he was an agent, stated that he entered this 50-acre parcel of property, that from the point where he entered the property, he did not even know where Aero Property was. Mr. Hartke testified he did not know where Aero Property was, so there can be no testimony in regards to that. From that point, where the trial judge found that he could see the 55-gallon drums, two 55-gallon drums, that he was in a position to view those two drums. There was no testimony that these drums could be observed anywhere from any other parcel of property outside of this 50-acre tract. The Exhibit 3, which is in the appendix at page 73, which is merely a depiction of a small area of this 50-acre tract, which depicts the 160-by-410-square-foot concrete enclosure, shows that the property around my client's property is full of trees. Mr. Hartke testified that the 50-acre tract was full of trees, abandoned vehicles, and some landscape waste, some brick coke ovens. That 50-acre tract wasn't owned by your client? That's correct. It belonged to the Ridgeview Trust? Correct. And the evidence is that neither Mr. Hartke or Mr. Haneke asked consent or permission from the owner to inspect the 50-acre tract or even the 10-acre tract of Aero Specialty. Either they did not get consent. They don't recall if they asked for consent or not. Are you talking about consent from the abutting landowner? I'm sorry? Are you talking about consent from your client or from the abutting landowner? Both. There's nothing in the record that shows that consent was given to search the 50-acre tract. And my client testified that he did not get consent. Let's just suppose that they violated the abutting landowner's constitutional right. How does that help you? They were not in a place where they could see the 255-gallon drums or even the items which the people charged my client with having, which they alleged was in violation of the Environmental Protection Act. So it was not in plain view. They did not have a right to be there. Well, with respect to your client, I mean, if they're violating somebody else's right and that's why they're there, how does that, does your client have standing to raise a violation of your neighbor's constitutional rights? Even if they had given consent, there's no testimony in the record that they were able to see the items contained in photographs 15, 16, and 17 from the neighbor's property. The testimony is that this is a large concrete structure. Mr. Hartke did not observe these items until after he saw the 255-barrel drums, which Mr. Hartke did not know was on Errol's property or not. And he did not observe these until once he had entered into the entryway into the property. I'm a little confused by the facts because Heneke was there more than once. And there were 255-gallon drums, I think, that were observed in 2007, maybe 2008, that your client actually provided receipts that they had been shipped. Then when Heneke came back in September of 2009, your client was there and gave him a tour and said, this is what I've cleaned up, this is what I've done, these are my accomplishments. I believe, but I could be wrong and I want you to clear me up, that it was that inspection in 2009 when they saw 255-gallon drums that became the basis of the charges. Am I incorrect? My understanding is that those aren't the two drums. Mr. Hartke, when he first did the inspection in 2007, and he took photos that are included in the record, took photos. Those two drums, 255-gallon drums, were outside of the concrete enclosure and neither witnessed in 2007. And you think it's those drums? Correct. Those are the two drums that Mr. Hartke testified he observed. Okay, then why are you talking about the concrete wall? Because those drums weren't within the concrete wall. That's correct. I'm talking about them in the sense that it was a trial court judge that found that those two 55-gallon drums that were outside the concrete wall were in plain view at the entrance to the 50-acre tract. So the point is that there's no evidence, none of the witnesses testified that they observed the 55-gallon drums from outside of the property. None of them knew the boundaries of arrow specialty either. So they did not know if those two 55-gallon drums were on arrow property or not. Just so I understand, when you were in front of the trial court, which search did you claim violated your client's constitutional rights? What year? One search, two searches, three searches. I'm unclear. Okay. We claim that all searches were unlawful. The first search was unlawful because Mr. Hartke did not have authority to be there. He did not have authority under the state statute to conduct a warrantless search. My client's business is not a pervasively regulated business. It's not only a non-pervasively regulated business or a closely regulated business, it's not even a regulated business. So is it true that the trial court found, as a matter of evaluating evidence, that those barrels were within plain view while Mr. Hartke was standing on the Bridgeview Trust property? Yes. Okay. So that's one search. You say the findings are against the manifest way to the evidence and that was wrong. They weren't within the open view. What's the next search that you think was unlawful? The next time Mr. Haneke came on the property and the next time after that. Because Mr. Haneke testified he only came onto the property because of Mr. Hartke's report. So our argument was... Kind of the fruit of the poisonous... Correct, Justice, correct. Okay. Would you agree that there were employees from Arrow during both subsequent searches that were cooperative and gave Mr. Haneke information? I believe that's correct. But that does not remove the requirement of lack of consent. Mr. Hartke and Mr. Haneke never said, may I have consent, or you have the right to refuse. It was always, I'm here, I'm the state, I have a right to be here. Do you think that he had a right to be on the business premises because customers had the right to be on the business premises? Because there's some indication in the record that customers would drop items off at that location, per se, in one state. Customarily, customers would go to the business office, which was, I think, about a mile away. Typically, that's what was done. There may have been some rare occasions where a customer had a big item that had to be dropped off. But other than that, the testimony of the trial court was that Arrow Specialty did not expect members of the public to come there. But were they prohibited? There was testimony by Mr. Newman at the trial that not only were there fences all around the property, on the north side and the south side, and there was a natural barrier on either of the other two sides, that at the north and south boundaries of the property, there were fences and a gate. And that there was no trespassing sign. Did Mr. Haneke climb over a fence to get to the property? Mr. Haneke's testimony is different than Mr. Harkey's testimony. Right, but Mr. Harkey was only there once, in 2007. Right. So in my brain, I've moved on from that. Okay, yes. When Mr. Haneke came back for the two subsequent searches, didn't he use an access road that was not restricted? Mr. Haneke, I believe, testified that he just followed the road down to the property. You have to keep in mind the mindset of Mr. Harkey and Mr. Haneke. They're of the position, and they testified at court, that they have a right to go anywhere they want, whether it's private property or public property, to enforce the Environmental Protection Act. I, you know, for the sake of argument, I'm not going to dispute that with you. Okay. I agree it's not a highly regulated industry, and maybe Mr. Haneke was incorrect when he said, I have a right to be here. Maybe, okay? Okay. So what was the search when he was there, the day your client gave him the tour? What did he search? The interior. That he couldn't see from just standing outside the property. Did he open containers? Did he go inside the buildings? He entered upon the property without first asking for consent to be there. Okay. Once you have the addition, you have the state arriving in a parcel, you know, a person's business, and the person says, I have a right to be here, you know, I think the normal person would say, would want to cooperate. But, you know, there's a state statute that provides that you need a warrant, or a constitutional provision that you need a warrant to search. Well, if somebody comes to your door and knocks on the door and says, can I come in, do they need a warrant? When you open the door? When you present yourself as an officer of the state and that you have a right to do it, then that's a little bit different than coming to the door and asking for permission. In the sense of a residence, you just don't come to the door and say, can I come in, and you do a search. But once you're inside the door, if you see cocaine sitting on the dining room table, that's a problem. That's a problem. So that's why I'm trying to boil down your argument. When did the search occur, and what was unlawful? If I understand your argument correctly, it's that Mr. Heneke did not have the authority to be there during either one of the two searches he did. Correct, because it was based upon Mr. Hartke's initial search that was done without consent. So if we find, or if we conclude, and I'm just hypothetically throwing this out, that the first search was not a search, what does that do to your argument? If it was indeed open fields, as the drug court found, what does that do to your argument about Mr. Heneke? I believe the key here is that the two 55-gallon drums were never charged as a violation of any Environmental Protection Act regulation. You're talking about the first two? The first two drums. 2007. Right. The judge found that those were in plain view, but there's no allegation that they were in violation of the law. They justify Mr. Hartke to go even further in regards to searching the property. So in answer to your question, that it would be our position that it would still be in violation because Mr. Heneke did not ask consent to do a subsequent investigation. And there's nothing in the state statute that authorizes the Environmental Protection Act to inspect arrows' property. They're not licensed. There's no specific statute that gives notice to anyone in the sandblasting industry that they have to keep records for the IPA or that they're going to be inspected at regular intervals. This was not even inspected at a regular interval. It was only because of the fact that Mr. Hartke followed a landscape truck into a 50-acre tract of property. Because he thought that somebody was illegally dumping. That's correct. On your property. Correct, and I don't believe there was any probable cause to believe that because they could have been coming back to the property the landscape items were taken from. That dumping was not on your property. That was on the Bridgeview Trust property. Correct, and Mr. Hartke's report indicates that he did find drums of red dye on the property that's used to tint wood chips. So evidently it wasn't being stockpiled or used to compost on site, but it was being used to manufacture a product. So perhaps that's why there was no evidence that anyone was ever charged with that offense for which Mr. Hartke states he came on to the property. But your client doesn't do woodwork and would not have been manufacturing those red wood chips. Correct. All right. I'm sorry. This is really fact-intensive, and that's why I'm so happy to have you to grill here today. Thank you. You're welcome. Any other questions? Thank you, Mr. Coburn. Thank you. Mr. Sultan Saida, is that correct? That's right. Good morning. May it please the Court, Counsel, and Assistant Attorney General Stephen Sultan Saidi on behalf of the people. The defendant's Fourth Amendment claim in this court fails for three independent reasons. First, Arrow had no reasonable expectation of privacy in its sandblasting site. Second, even if it did, it was engaged in a closely regulated activity, and the Environmental Protection Act authorized the inspection. And three, even if there was a Fourth Amendment violation, the exclusionary rule should not apply in a civil case where there were no law enforcement agents involved. Now, I'm going to focus on the first of these, that Arrow had no reasonable expectation of privacy in its sandblasting site, although, of course, I'd be more than happy to answer questions about the other two. And for the reasons stated in our brief, we think they support the judgment. Why do you think this is a closely regulated activity? Well, I think because it's closely regulated by the provisions in the Environmental Protection Act, specifically the ones that apply here, the open dumping. Arrow is engaged, apparently, on the record in multiple activities, including painting, things like that. But here, it was also engaged in dumping of refuse. And under the statute, what it was doing was open dumping on a site that wasn't authorized to do open dumping. That's the reason it violated the statute. And the Act very closely regulates that type of dumping. There's not only the open dumping procedures, there are licensing procedures. What was the violation they were charged with? It's literally called open dumping, Your Honor. It's under Section 21 of the Act. And Section 21A just says that it's a violation to cause or allow the open dumping of waste. And then another provision, they define what open dumping means. Well, if I've got a business making cookies, and I've got a big yard, and I go out and dump some improper materials on the property that is owned by where I make cookies, does that turn the cookie business into a closely regulated business? Your Honor, I think to the extent that it was that – well, let me read the definition of open dumping. I think it will help give context to the argument. Open dumping is the consolidation of refuse from one or more sources at a disposal site that does not fulfill the requirements of the landfill. So I think we're talking about more than just garbage. We're talking about consolidation of refuse. Well, I guess what I'm saying is normally if you're a closely regulated business, the business by definition is closely regulated. And ergo, this gives certain rights and responsibilities and vulnerabilities to state inspection. But then to say, well, because your violation of the law turned you into a closely regulated business, and therefore it was that that allowed us to come on there. In other words, usually an agent of the state would know whether this was a closely regulated business or not before even entering the property because, well – They might have a license. They were required to have a license. I think that's true, Your Honor, although I think the license issue is interesting because to do the type of dumping, they could have done what they were doing if they were licensed. They weren't open for purposes of allowing people to bring refuse to that location. They were open to sandblast materials. Help me understand what was the issue with respect to the charges that were filed. Was it the sandblast residue that had piled up? Or was it the two 50-gallon drums that were discovered in 2009? Yes, Your Honor. I believe in the allegations in the complaint are far broader than I think the circuit court's ultimate judgment. So the circuit court ultimately says, references the testimony of the inspectors, but also two sets of photographs. One was a set of photographs taken by Inspector Hartke at his initial inspection, I believe in June 2007. And then a second set of photographs taken by Inspector Haneke in August 2007. That was Mr. Haneke's first inspection. It was the second total inspection, but Mr. Haneke's first one. So those photographs, my understanding, it's a little unclear from the record. And the photographs, as we have them in our appellate record, are not crystal clear. But it appears those are all – that's all refuse and some of the drums. But I don't think those are the drums. I think the most fair reading of the record is that those are not the drums initially seen on the outside of that wall by Mr. Hartke at his first inspection. Okay, so my question is, when Arrow was charged and ultimately fined $5,000, what was the basis for that? What was the act? What was the accumulation? I believe it was – What material? And I believe there was other refuse related to the same blasting operation. For example, there were aerosol cans. There was burnt copper wire that Mr. Hartke testified that he saw during his inspection. There were – Which year? This is – Mr. Hartke's inspection was, I believe, June 2007. There were three inspections. Mr. Hartke makes one inspection in June 2007. Mr. Haneke comes back in August 2007. And then he comes back again for his second inspection. 2009, wasn't it? Well, yeah. So his second inspection, I believe, was September 2007. So he makes two in 2007, fairly close in time. Okay. The second is where Mr. – And no charges were filed then. And he did a follow-up investigation because they gave Arrow time to clean up, which is pretty customary. Yes, John. They gave Arrow time to clean up, and so I just need to understand what it is that gave rise to the violation. Your Honor, I think all – there was evidence gathered at all these inspections that were entered into the record. The charges were based on refuse seen at multiple inspections. And the evidence – there was evidence from multiple inspections, evidence of their violation of statute. And the circuit court relied on evidence from multiple inspections. Does that clarify? Sorry. Move on. I know your time is up. Well, let me ask one thing. The first – you know, these two 55-gallon drums. Yes, Your Honor. What was – if one looked at those 55-gallon drums from a distance, what was it about them that would tell somebody this is hazardous waste or something? There was a – Mr. Hartke testifies – he sees these two 55-gallon drums on the outside of the retaining wall, and he testifies he sees green opaque liquid in the actual drums and that there's dark staining on the ground around the drums. And there's other testimony in the record that this type of containment of certain liquids – they don't know at the time exactly what these liquids are, but they're stored in a way that might allow them to enter the environment. And that raises a red flag when you're inspecting for these types of environmental violations. During the cleanup process, wasn't Errol instructed to put items such as that on the concrete floor so that it was less likely it would leak into the ground? I believe there's something to that effect in the record, Your Honor. He did that? Yes. I think at the final inspection that Mr. Haneke does – Mr. Haneke at least testifies. Now, whether his testimony necessarily is determinative of whether there's a violation or not, I'm not – I don't think it's true. But Mr. Haneke at least testifies he doesn't see any new violations in 2011. So I think to Your Honor's question about cleanup, they were given instructions, and I think for the most part they complied with those instructions ultimately. But there was enough evidence of open dumping over the course of these inspections, and based on Mr. Haneke's initial evidence gathered at the initial inspection, that there was at least one open dumping violation according to the circuit court. Now, as a – just quickly, if I can turn to Errol's reasonable expectation of privacy here, I think the Supreme Court's open field doctrines establish two things that are relevant here, and I think responsive to a defendant's argument in this court. First, those cases reject the idea that entry onto private land by itself is a violation of the Fourth Amendment. And they establish that to determine if there's a reasonable expectation of privacy, it's a fact-intensive inquiry, just as Your Honor said, of course. But what we ask is, does the area harbor the intimate activities of the home or of a business, or the privacies of life? And here I think the answer is no. These are – even within the retaining walls, this concrete wall, the walls are only four feet high in many places, so that Mr. Haneke can see over the wall to the ground on the inside. There's no roof. There's no door. There's an opening that's literally large enough that Mr. Haneke can drive his truck through it. There's nothing else suggesting that this was a place harboring the intimacies of life, the privacies of Arrow's business. Arrow had an office that probably did harbor privacies of its business. The circuit court made factual findings that this was an urban wilderness where the public was likely to wander and to explore, and for that reason it found there was no reasonable expectation of privacy here. There was a fence, apparently, on the perimeter, according to Mr. Newman's testimony, at least. Now, that's not Arrow's land. That's Bridgeview Trust's land. So the fact that there's a fence there wouldn't be relevant anyway. But in any event, in these open fields doctrine cases we discussed in our brief, in Dunn and in Oliver, those inspectors, in one instance, climbed over a fence to get onto the defendant's private land. In another case, they went around a locked gate where there was no trespassing sign and went directly onto the defendant's private land. And the court said that didn't mean that there was a reasonable expectation of privacy in this land. You can't create an expectation of privacy that society recognizes as reasonable just by putting a fence around your land. The question is, what's the character of the area searched? So agents can enter private land, they can even climb over fences, and they can enter open areas, and that's what happened here. They didn't climb over fences. Well, yes, Your Honor. Here they did not climb over fences. They did not have to go through a locked gate. But they go to an open site, and both inspectors consistently testified that they didn't have to open any doors, open any gates, and the site is open and uncovered with low walls. Your Honor, just finally on that point, let me just say what we're not arguing here. We're not saying that these inspectors can go wherever they want. We're not arguing that these inspectors can enter any kind of business they want for whatever purpose. The Fourth Amendment doesn't allow that. That's not the whole thing we're asking for. But it's well settled that inspectors can enter open fields and inspect open areas, and that's exactly what we have here. It's a sandblasting operation taking place out in the open, surrounded by low walls, uncovered, with a large opening. The inspection takes place during the daytime. This is in contrast to People v. Janus, which is a case that the defendant relies on in their briefs. That was a nighttime inspection in a place where the public could not be because the adjacent business was closed. Here we don't have an adjacent business. We have a daytime inspection of an open area. It's an open space. Arrow had no reasonable expectation of privacy there. And for this reason, we ask that this Court affirm the judgment of the Circuit Court. The Court has no questions. Thank you very much. Thank you. Mr. Urban, any rebuttal? Yes. It is our position that People v. Janus, the Illinois Supreme Court case, is relevant to the issues before this Court. In Janus, the trial court denied the defendant's motion to suppress evidence. The evidence in that case was that there was an open area behind the business that was accessible to the public if they went through private property and came onto the back of the defendant's property in that case. And there were some restrictions to access, but still there was an open way to get into that area. The Supreme Court said in reversing the trial court's suppression of denial to suppress the evidence said that there's enough evidence here that the defendant did have a reasonable expectation of privacy in an outdoor area behind his business and that the trial court was wrong. So they remanded it back to the trial court to allow the people to present additional evidence. So that's basically what we have here, except for the fact that the defendant's business is conducted in the open air because it's conducive to do that, but it's within a large concrete structure and there was no testimony that Mr. Haneke or Mr. Harkey actually looked over the concrete wall to see the items inside. The complaint itself appears to show that there was no evidence that they approached the concrete structure and actually looked over it. There's testimony that they believe that you could do it. It's like there's a window to a building and they could look in through a window. Didn't Mr. Harkey drive through the opening in the cement foundation? Yes, but the testimony was that this wall along the sides, other than where the entrance was, was only maybe four feet above the ground surface. Therefore, someone could walk to the wall and look down into it. And in looking at the complaint, I believe a fair reading of the complaint, is that open dumping results when you have open containers. And the complaint actually alleges that there were open one-gallon and five-gallon containers that could allow items to evaporate into the atmosphere or rainwater to go into the cans and therefore run out onto the surface. And that was considered to be open dumping because those items were on the site and they were open. Mr. Harkey testified that open dumping occurs with the sandblast material once the items are there for over a year. So you can have mounds and mounds of spent sandblast material, but if it's not more than a year, then it's not open dumping. I believe a fair reading of the complaint is that the open dumping comes from the items that this business generated and did not remove in a timely fashion. The two 55-gallon drums on the outside, there was no testimony that those were uncovered. Mr. Harkey testified that he looked into one. The assumption is that he didn't look in the other one because evidently my supposition is that both were closed. Otherwise, that would have been a violation if it was open to the atmosphere. But Mr. Arrow, I believe a fair reading of the complaint is that those outdoor drums were not a part of the open dumping. So it's our position that Mr. Arrow especially did have an expectation of privacy and that's exactly what the inspectors did here was they believed that they had a right to go where they want. And it's our position that they did not and that the Constitution requires that they obtain a warrant to search in this particular case and they did not. And the actual items that were constituted open dumping were inside the structure and there's no testimony that those items were observed outside of the structure itself. So there's no open fields. They actually had to go into the building, into the structure to see the open one and five-gallon containers. Mr. Harkey testified that he saw the 55-gallon drums and then got into his vehicle and entered into the entryway into the structure. The open drums were in the northern part and then he drove around to the southern part, I think is what he testified to. He actually had to get in his vehicle and drive. Right, he drove around the 50-acre track. And he entered into the, following the landscape truck, he told them that they couldn't do what they did. He looked for the property owner and then he went to various locations on the property, went north and then came all the way down south and that's where he saw 55-gallon drums. And then from there, he took his vehicle into the entryway, into the concrete structure. I'll take just one minute. When he drove onto the property the first time, who maintained that road? Was it a Park Service road? No, that particular road is on the property, if you call it a road, but it's on the 50-acre track. It's not maintained by the state. Mr. Harkey testified that from Columbia Street onto the trust property, he did not know who owned the property between Columbia Street and the trust property, the last public road. And he didn't know if it was a mile from the last public road or five miles. He did not know any distance. Regardless, that road is not the road that Errol constructed. When Hanneke left the northern part and then got access to the southern part, he did drive on the road that Errol constructed? If you don't know, that's fine. I don't know for sure, Your Honor. How about the sandblasting materials? Were they on the foundation, within the walls, or were they elsewhere? They were within the walls, on the concrete foundation of the property. I've interrupted you, so you weren't allowed the last minute to summarize. Hopefully my colleagues won't oppose me letting you finish. Thank you. It's our position that Mr. Harkey and Mr. Hanneke conducted an awful search of my client's property, that my client had a reasonable expectation of privacy within the four walls of the structure. Mr. Harkey did not observe any violations of the Environmental Protection Act, of which my client was guilty until he actually entered into the property. He did not obtain consent to do that. He did not ask consent. He testified that only if a property owner objected to them being there or told them they had to leave, that they would leave. And it's our position that that's not constitutional to require that. It should be that they request permission to be there and affirmatively seek permission rather than take the position that I'm the state and I can go where I want unless somebody objects. Do you think he was acting in bad faith when he made that assertion? I believe he believed it. So he believed that he had the right to do it. The argument was that the statute says that you have a right to be on private or public property, and I don't believe that that's the law. I appreciate your candor on that point. Thank you. Thank you. We thank both of you for your arguments this morning. We'll take the matter under advisement and we'll issue a written decision as quickly as possible. The Court will now stand in brief recess for a panel change.